<hr/>

J. A. WEAVER v. B. F. ASHCROFT.

1. FRAUDULENT SALE—CHARGE OF COURT.—See instructions held defective, as failing to submit the issue whether a transfer of a stock of goods was fraudulent.

2. SAME.—See facts in which a charge submitting to the jury whether the transfer was a justifiable preference of a certain class of creditors of the party making the transfer was held erroneous.

3. PARTNERSHIP DEBTS—ASSIGNMENT BY PARTNER.—One member of the firm assigned his interest in the partnership stock; the stock was seized, by attachment against the party making the transfer, at suit of an individual creditor: Held, That it was error to submit as

a controlling issue whether the assignment was made for preference of the partnership creditors.

4. SAME.—Such transfer destroyed the right of preference by partnership creditors to so much of the firm assets as, in shape of notes and accounts of the firm, were taken by the retiring member in consideration of his assignment of interest in the partnership stock.

5. SUCH CHARGE was inconsistent with the following charge given : "That the party making the assignment might have done so in order to get his interest in the firm accounts to pay his individual debts."

6. FRAUD, EVIDENCE OF.—Held erroneous to charge that "fraud will not be presumed, but must be proved like any other fact, and the burden of such proof rests on the party who alleges such fraud," without some further explanation as to the character of evidence by which fraud may be established.

7. EXEMPLARY DAMAGES.—In a suit for damage against a sheriff for seizure under an attachment of goods, there being no evidence of ill-feeling or improper motive on part of the sheriff, it was error to allow exemplary damages.

8. PARTNERSHIP GOODS MAY BE LEVIED ON FOR INDIVIDUAL DEBTS OF A MEMBER OF FIRM.—Partnership goods may be levied on to satisfy the ind'vidual debts of a member of the firm, to the extent of such member's interest.

9. EVIDENCE—DECLARATIONS OF INTENT.—Held error to allow in evidence declarations of intent, made by a party in his own behalf and negativing fraud, made anterior to the transfer and in no way connected with the transaction.

10. TENDER IN TORT.—A tort is not cured by a tender without acceptance.

11. DAMAGES IN TRESPASS.—The measure of damage for illegal seizure and conversion of goods is the value thereof at time of the seizure, and eight per centum interest per annum from its date.

APPEAL from Hopkins.    Tried below before the Hon. Green J. Clark.

The facts are fully stated in the opinion, in which will be found the charges referred to in appellant's brief.

*Crawford & Crawford*, for appellant.    [Their brief did not reach the reporters.]

*Robertson & Herndon*, also for appellant.

I. The court erred in giving the sixth special charge asked

by plaintiff. (Briscoe *v.* Bronaugh, 1 Tex., 335; 1 Story's Eq., 206; 8 Pet., 244; Burch *v.* Smith, 15 Tex., 223.)

II. The court erred in the eleventh and twelfth paragraphs of the general charge, and the fifth, eighth, ninth, and tenth special charges asked by the plaintiff and given by the court, because the same present the transaction between Russell and Ashcroft as a preference, when there was no evidence of a preference. (See definition of the word preference in 2 Bouv. Law Dict., 362.)

The sale of partnership property by one partner to another converts the partnership into the individual property of the vendor and subject to his individual debts. (3 Kent's Comm., 65; 6 Ves., 119; 11 Ves., 3–6; Story on Part., secs. 3, 5, 8.) This is true even though the vendor agrees to pay the partnership debts. (Rogers *v.* Nichols, 20 Tex., 724.)

Partnership creditors are entitled to priority of payment over individual creditors, and this right they can assert even though a levy has been made on the partnership property by one of the individual creditors. (42 Tex., 34; 25 Tex. Supp., 60; 20 Tex., 714.)

The errors in those charges were sufficient to entitle the appellant to a reversal of the judgment. (Hancock *v.* Horan, 15 Tex., 511; Hall *v.* Pearman, 20 Tex., 168.)

The fifth special charge asked by appellee and given by the court was error, because the jury are charged that it was the duty of Russell to prefer his partnership to his individual creditors. (Bump on Fraudulent Conveyances, 180.)

III. The third and latter part of the fifth paragraphs were error, because there were neither parties nor pleadings to authorize such a charge, and because this was contrary to our statute prescribing the order of making levies. (Paschal's Dig., sec. 3775.)

There is no question but that partnership property may be levied on to satisfy the debts of individual creditors. (20 Tex., 719; 25 Tex. Supp., 60; 42 Tex., 34.)

Partnership property should, therefore, be levied on like any other interest in chattels.

·IV. The thirteenth paragraph of the general charge was error, because it submitted to the jury the question of vindictive damages, when there is no evidence in the record to authorize such a charge. (Dillon *v.* Rogers, 36 Tex., 153; Mickie *v.* McGehee, 27 Tex., 138; Chandler *v.* Von Roeder, 24 How., 224.)

V. The court erred in refusing the special charge asked by the defendant. The law on the measure of damages applicable to the evidence in this case was here correctly given, and was nowhere given by the court. ( 24 Tex., 493; 21 Tex., 593.)

The measure of damages is a pure question of law. ( Sedg. on Dam., 202.)

If the appellant tendered the property back, appellee was only entitled to nominal damages. (Sedg. on Dam., 492, 548.)

VI. The court erred in giving the ninth special charge, because it is an unfounded argument of the plaintiff's counsel, clothed in the guise of a legal proposition, in this: that it suggests to the jury that Russell took notes and accounts for his interest in the partnership property for the purpose of paying his individual debts, when the evidence warrants no such conclusion, even for the jury to draw.

VII. The verdict in this case is excessive. The evidence will show that applying the rule laid down in the charge as correct, and assuming the untenable position that the defendant was liable for the value of the entire stock of goods that he levied·on and those he did not, and taking the highest estimate placed on the stock by the figures in the record, still the verdict is much too large—more than double what it should be; but take the true rule, that defendant was only liable for the goods actually levied on by him, and the verdict is oppressive and nearly ten times larger than it should have been. In either case the verdict should be set aside for excess.

VIII. The evidence of fraud is almost irresistible in this case, when we consider the relations of the parties; the nature of his business; the hopeless insolvency of Russell; the pressure, which was heavy, brought to bear upon him; the knowledge of Ashcroft during the efforts of the creditors to get the money; the offers of compromise and the threats of bankruptcy. The whole presents such a case, and leaves the mind in but little or no doubt as to the fraudulent design of Russell and the participation in it by Ashcroft.

*Sam. J. Hunter,* for appellee.—There are three issues in this case—

1st. Was the transfer from Russell to Ashcroft, for his interest in the stock of goods mentioned in the petition, fraudulent?

2d. Did Weaver seize and dispossess Ashcroft of the entire stock of goods, or only part?

3d. Were the goods worth $10,660.95, including interest at eight per cent. from the 29th of July, 1871, up to February 24, 1877?

True, this last question arises out of the verdict of the jury; but we are frank to admit that it becomes in this court a very material question.

We believe, however, that there is ample evidence in the record to support it, even without appealing to the law allowing vindictive damages; but we shall insist upon both.

It seems from the authorities cited by counsel for appellant that they are desirous of raising here a charge of fraud against the first contract, whereby Ashcroft became a partner of Russell; but the court will observe from the pleadings that no issue on that transaction is raised by them.

We say, then, first, that the transfer from Russell to Ashcroft was not fraudulent on account of any of the grounds alleged by the appellant; for we are, of course, confined to the charges made.

The consideration was valuable and adequate, and fully paid.  *  *  *

The appellant has the burden of proof. Fraud cannot be presumed; it must be actually proved, or be a conclusion from facts that will not admit of any other conclusion consistent with fair dealing. (1 Greenl. Ev.; Tompkins v. Bennett, 3 Tex., 36, 47; Paxton v. Boyce, 1 Tex., 317, 324, 325; Walcott v. Brander, 10 Tex., 424; Kellum v. Smith, 18 Tex., 849; Burch v. Smith, 15 Tex., 224.)

It is the settled doctrine of this court that fraud is a question of fact for the consideration and finding of the jury, (Briscoe v. Bronaugh, 1 Tex., 326; Bryant v. Kelton, 1 Tex., 415; DeLeon v. White, 9 Tex., 598,) and the amount of evidence necessary to prove fraud is always left with the jury. (Howerton v. Holt, 23 Tex., 51; Baldwin v. Peet, 22 Tex., 708; Green v. Banks, 24 Tex., 519, 520.) The jury must judge of fraud as of other facts submitted to them in our courts. (Goodrich v. Downs, 6 Hill, 438; Linn v. Wright, 18 Tex., 337; Seward v. Jackson, 8 Cow., 406.)

In rebutting the facts proven by appellant from which he would draw an inference of fraud, we say, that if we did no more than what law, equity, and justice would require us to do, our act cannot in law be fraudulent; and partnership effects cannot be taken and sold for a debt of one of the partners. (Story on Part., secs. 263, 264; Rogers v. Nichols, 20 Tex., 724; Warren v. Wallis, 38 Tex., 225, and as modified by 42 Tex.) An injunction will even be granted to prevent it. (20 Tex., 725; Converse v. McKee, 14 Tex., 30.)

One partner cannot even pay an individual debt out of the partnership without the consent of the other. (Shiriff v. Wilks, 1 East, 48; Ex-parte Benbonus, 8 Ves., 540; Goode v. McCartney, 10 Tex., 196.)

Partnership creditors have a priority over the partnership property, and individual creditors a priority over the individual property. (3 Paige, 518; 2 Paige, 400; 2 McCord's Ch., 301; 3 Hamm., 288; 7 Paige, 26; 6 Paige, 19; 4 Johns.

Ch., 525; 5 Johns. Ch., 428; 2 DeSaus., 270; 3 DeSaus., 203; 2 Edw., 28; 1 Green's Ch., 163; 3 Bland's Ch., 356; 7 B. Monr., 210; 2 Barb. Ch., 165; 4 Ves., 396; 17 Ves., 115; 1 Gratt., 396; 4 Johns. Ch., 522; 4 Sandf. Ch., 223; 4 Conn., 540; 10 Gill & Johns., 253; 8 How., 414; 11 Wall., 628; 4 Bush, (Ky.,) 25; Converse *v.* McKee, 14 Tex., 30, 31.)

A transfer of property to one creditor in preference to another equally meritorious, is not fraudulent. (Greenwalt *v.* Austin, 1 Grant's Cas., (Penn.,) 169; U. S. Dig., vol. 19, secs. 19, 20, p. 331.)

We submit that the charges of the court submitted the question of fraud as fairly to the jury as the defendant ought to require; indeed, in some respects they are stronger against the appellee than the law warrants under the facts proven.

The jury having found no fraud in the transaction, we feel that this court will not disturb their verdict on that ground.

Now as to the value of the goods taken from appellee. First, we insist that the whole stock of goods was taken from our possession when Weaver entered the store-house, put Ashcroft out, shut the doors, locked them, and put the keys in his pocket.

This was done by force of arms. True, the capture was an easy one; not a gun was fired. The despoiler came muffled and wrapped in the cloak of judicial power and authority. The fear of the law against resisting officers disarmed the appellee and made him submit without show of resistance to the wrongful and oppressive act that at one blow crushed him as a merchant and made him a beggar.

Put it in the strongest light that appellant can claim under his pleadings,—that is, that Russell and Ashcroft were partners,—then we say that Weaver was a trespasser.

The sheriff is a trespasser when he levies on goods of a partnership under a writ against one of the partners. (1 Am. Lead. Cas., p. 322; 2 Hill. on Torts, 320, note at top; 25 Tex. Supp., 56; Story on Part., 263; 1 Story's Eq., 677; Hill. on. Inj., sec. 3, p. 424.)

28

But we insist that the stock of goods belonged to appellee exclusively, and the sheriff certainly was a trespasser under that view of the case. And being a trespasser *ab initio*, his act, in closing the house and driving Ashcroft from the possession of the goods, was a seizure and conversion of the whole stock, and it would make no difference, as we apprehend, whether the trespasser kept them in his possession for ten minutes or ten years.

We believe it is otherwise where the sheriff rightfully levies upon the intangible, undivided interest of a partner in the partnership effects; but this levy was not so made. What right did Mr. Weaver have to divide, set apart, and declare Russell's share of the partnership effects, even if he were a partner? Why, Russell himself could not have done so without a bill in equity.

Then we insist that if Weaver was a trespasser, Ashcroft was under no obligation to accept his kindness when he tendered back the sacked and plundered house and broken stock of goods. There is no law in the land requiring him to accept it. He had his election to condone the wrong and injury and lick the harsh hand of him who had prostrated him, or appeal to the just laws of his country for redress. His manhood and his pride of character dictated the latter. It was not in his nature to lie prostrate and quiet under the smarting charges of fraud and smuggling that are charged against him in this cause. He "put himself upon the country" for redress and vindication; and twice his good countrymen have said that they found "no evil in the man," but awarded him compensation for his losses.

It is insisted that they have given him too much. The law can only be just. We ask nothing more; but we say that vindictive damages may be awarded in cases of this character. We allege that the act was done in malice and was oppressive. (5 Tex., 149; 2 Tex., 463; 6 Tex., 266; Sedg. on Dam., 38.)

Malice in torts is "the doing any act injurious to another

without a just cause; without exercising caution before doing an injury to another." ( 2 Bouv. Law Dict., title MALICE; p. 98; 11 S. & R., 39, 40.)

Weaver was told when he came to levy the attachment that the goods belonged to appellee. He did not hesitate, nor stop and investigate. Ashcroft told him that the goods were his, and that the man who closed him up would have to pay for it. Weaver's answer was, "I am the man." It was not a blind, rash act, so much as a considered step. Even indemnifying bonds were required and given. Weaver was not bound to levy even after the bond was given. His writ never commanded him to levy upon Ashcroft's goods.

Damage to credit. (Darcy *v.* Turner, 46 Tex., 33.)

But there is ample evidence in the record to sustain the verdict for actual damages.    *    *    *

Now, we submit to the court that if there is evidence in the record to sustain the verdict, the rule is to let it stand. " The verdict must be clearly wrong before the court will set it aside." (Long *v.* Steiger, 8 Tex., 462; Gamage *v.* Trawick, 19 Tex., 64; Perry *v.* Robinson, 2 Tex., 491; 19 Tex., 152, 226; 15 Tex., 410; 7 Tex., 587; 8 Tex., 336; 11 Tex., 321; 22 Tex., 42; 27 Tex., 241; 28 Tex., 676; 35 Tex., 37, 362, 585.)

It is not enough that it is not clear that it is right, or that there was conflicting evidence. (Briscoe *v.* Bronaugh, 1 Tex., 340; Edrington *v.* Kiger, 4 Tex., 93; 8 Tex., 331; 19 Tex., 101; 28 Tex., 775.)

This court will not reverse merely because the evidence looks doubtful. (Swinney *v.* Booth, 28 Tex., 113.)

Where there was conflicting testimony on every point it was refused. ( 27 Tex., 262.) Where there is evidence tending to support the verdict, and not a very great weight of evidence clearly proving the contrary, a new trial will not be granted. (Latham *v.* Selkirk, 11 Tex., 321; 3 Tex., 495; 5 Tex., 102; 25 Tex., 91; 25 Tex. Supp., 374–380; Cochran *v.* Winburn, 13 Tex., 148.)

It is clear, however, from the verdict, that the jury found that Russell had no interest in the goods, was not a partner, and hence the question as to whether other property of Russell's could be found, as presented in the third and fifth charges, did not and could not injuriously affect the appellant. If they had found that Russell was a partner, (and the charge submitted this issue to them,) the charge of the court, then, was clear and positive that they should find for defendant.

We think that no material error was committed on the trial; that there is ample evidence to support the verdict. We therefore respectfully ask that the judgment be affirmed.

GOULD, ASSOCIATE JUSTICE.—B. F. Ashcroft seeks in this suit to recover damages of James A. Weaver, sheriff of Hopkins county, for an alleged trespass in forcibly taking possession of a stock of goods, alleged by Ashcroft to be his property, and of the store-house in which said goods were kept for sale. The sheriff was acting under an attachment against the property of Isham Russell, who was, up to July 21, 1871, in partnership with Ashcroft, but who on that day had executed to Ashcroft a transfer or bill of sale of his interest in the stock of goods. Weaver alleged that this sale or transfer was fraudulent.

Previous to January 18, 1871, Russell was doing business on his own account in this store-house and in part with the same goods. On that day he sold a half interest in the business to Ashcroft. An inventory of the stock of goods then on hand at invoice prices amounted to $3,544, and the terms on which Ashcroft became a partner were that he was to pay Russell $1,000 in gold when called on, and to pay interest on the balance of one-half of $3,544 gold. The $1,000 gold was, some month or two afterwards, paid to Russell, and appropriated in Ashcroft's presence to pay off an incumbrance on Russell's homestead. After Ashcroft and Russell became partners the firm purchased over $4,000 worth of goods, all

on credit, and carried on business about six months, until July 21, 1871, when, as before stated, Russell sold to Ashcroft his interest in the stock of goods.

By the terms of this sale Ashcroft took the goods and assumed to pay the firm debts; Russell took the books and accounts due the firm, amounting to $1,823, and some items of firm property. It appears that in making this trade the parties assumed that the firm had neither made nor lost, and that Russell was to receive out of the firm enough, with the $1,000 gold before paid by Ashcroft, to pay him $3,544 currency, the invoice price of the goods which he brought into the partnership. This sale or dissolution was promptly announced in the county paper, and was followed soon by an attachment, sued out by E. Marx, an individual creditor of Russell, for goods sold him whilst merchandizing alone. Russell, it seems, was in debt between $5,000 and $6,000 at the time he and Ashcroft became partners, and during the existence of the firm his creditors were pressing him for payment. Ashcroft claimed and testified that he was ignorant of Russell's embarrassed condition, and there is other testimony that up to July 21, 1871, both he and Ashcroft were regarded as solvent and trustworthy. On the other hand, there was evidence of repeated applications to Russell by the agents of his individual mercantile creditors for payment of their claims, made at the store, and whilst Ashcroft was there; and it appears from the testimony of Russell that some of these creditors proposed to him to take 50 cents on the dollar on their claims. On Saturday, July 29, 1871, Weaver, disregarding the protest of Ashcroft, levied the attachment against Russell, in favor of E. Marx, for $1,572.92, on the goods in Ashcroft's possession. He took possession of the store-house and stock of goods, and retained it whilst making an invoice of the goods attached, amounting to $1,595.88.

This invoice was not completed and copied until the following Wednesday, when Weaver tendered a copy thereof to plaintiff Ashcroft, tendering him also the key of the store-

house and possession of the remaining goods. Ashcroft, who says he had understood Weaver to levy on his entire stock, and who had already, on August 1, instituted this suit, refused to receive the key or the remainder of the goods unless Weaver would also give him an invoice of what was left. This Weaver refused to do, and the goods, except $800 worth levied on some weeks later by Weaver's directions, appear to have remained in the store-house, and the key in Weaver's possession, until, in 1873, the house, which belonged to Russell, and all that was then in it, was delivered by Weaver to Russell. What goods were then in the house, and what ultimately became of them or of the stock not attached, the record fails to show.

In defendant's answer it was alleged that the sale to Ashcroft was fraudulent, and that, the goods being subject to levy by virtue of the attachment, he levied on goods to the amount of $1,595.88, kept possession of the house and goods no longer than was necessary to separate the amount of goods levied upon, and then tendered the key and remaining goods to plaintiff, who refused, and had continued to refuse, to receive them.

After one mistrial and one new trial granted to defendant, the case was tried in January, 1877, resulting in a verdict for plaintiff for $10,660.95.

On the trial the primary issue was as to the validity of the transfer from Russell to Ashcroft. If that transfer was not fraudulent, but was valid, the goods were Ashcroft's property, the sheriff in seizing them was guilty of a trespass, and the only other questions were as to the extent of that trespass and as to the measure of damages.

Clearly, it was important to the defendant that this primary or leading issue be submitted to the jury, with correct instructions as to the law bearing thereon. If the charge of the court as given embodies any material error of law which may have misled the jury on this issue to defendant's prejudice, he is entitled to another trial. Our opinion is that the

charge contains such error.   We copy those paragraphs of the charge only on which we propose to comment:

"11. A debtor in failing circumstances may prefer one creditor to another, and where partners owe individual debts and partnership debts, the partnership creditors have, in law and equity, a right to have their partnership debts first paid out of the partnership effects.   And if the jury believe from the evidence that prior to the 29th of July, 1871, Isham Russell and B. F. Ashcroft were partners, doing business as merchants, and that the firm was at that time indebted to others, and that Russell was also indebted to E. Marx and others on his individual account, and that Russell sold to Ashcroft his interest in the partnership effects for the purpose of paying the debts of the firm of Russell & Ashcroft, and not for the purpose of defrauding the individual creditors of Russell, the jury should find for the plaintiff.

"12. If the object of the sale of the partnership goods of Russell & Ashcroft was in part to provide for the firm creditors, and the sale was made in good faith for that purpose, and not for the purpose of defrauding the individual creditors of Russell, the plaintiff is entitled to recover, and the jury should find accordingly.   If the jury believe from the evidence that the goods were seized, while in the possession of the plaintiff, by virtue of a writ of attachment against Russell, they should find for the plaintiff, unless it satisfactorily appears from the evidence that the goods seized were the property of Russell, or that he had an interest in them as a partner of Ashcroft.

"13. If the jury believe from the evidence that the goods seized upon were the property of the plaintiff, and defendant at the time of such seizure was the sheriff of Hopkins county, and that in the discharge of his official duties as such sheriff he seized the goods in good faith and under the belief that they were Russell's goods, or that he had an interest in them, and that in making the levy he did not in fact act from a malicious motive or intention to injure or oppress the plain-

tiff, the measure of damages will be the value of the goods seized, at their fair cash valuation in Sulphur Springs at the time of their seizure, with interest thereon from that date at the rate of eight per cent. per annum; but if he acted without probable cause to believe that they were the plaintiff's goods, and with the intent to injure the plaintiff, the jury may find such fair and reasonable additional damages as the facts and circumstances may warrant.

"If the jury find for the plaintiff, the form of their verdict will be: 'We, the jury, find for the plaintiff, and assess his damages at $ ————,' filling up the blank with the amount selected by the jury. If they find for the defendant, they simply say so by their verdict."

Charge asked by plaintiff and given by the court:

" 5. It is not only the right, but the duty of partners to provide for the payment of the partnership debts; and if you believe from the evidence that Ashcroft & Russell were partners in merchandise, and that they mutually dissolved their partnership by a fair and open transaction, by which the notes and accounts were conveyed to Russell and the stock of goods conveyed to Ashcroft incumbered with the payment of the firm debts, without any intention to defraud upon their part, the creditors of one of the partners have no right to complain, and the stock of goods would not be liable to seizure for Russell's debts, and the sheriff in making such seizure would be responsible in damages for such wrongful seizure.

" 6. Fraud will not be presumed, but must be proved like any other fact, and the burden of such proof rests on the party who alleges fraud.

" 8. Even if Russell was insolvent before he made the trade with Ashcroft, by which the entire stock of goods was sold to Ashcroft, if the trade was fairly and honestly made, with the view of providing for the payment of the partnership debts out of the stock of goods in Ashcroft's hands, and if the whole transaction was fair and open Ashcroft took a good title to the goods, and you will find for the plaintiff his damages in

the value of the stock of goods at the time of such seizure, with eight per cent. interest per annum up to the present time.

"9. A debtor, even in failing circumstances, may prefer one creditor to another; and if Isham Russell was insolvent individually, and sold his interest in the partnership goods to Ashcroft with the honest purpose of providing for the payment of the partnership debts, and to get his interest in the firm accounts in order to pay on his individual debts, without any intention of hindering or defrauding his creditors, such transaction would not defeat the title of Ashcroft in the stock of goods, nor would such goods be subject to seizure for Russell's debts.

"10. Whatever might have been the intention of Isham Russell in making the sale to Ashcroft, if the transaction on Ashcroft's part was fair and honest, and he bought out Russell with the honest purpose of securing the payment of the partnership debts, and that he did in good faith purchase said stock of goods for a valuable consideration, and assume the payment of such debts without any participation in or knowledge of any fraudulent intent, then he cannot be disturbed in the possession of his goods; and if the same were seized for Russell's debt, such seizure was wrongful.

"11. An officer of the law, in executing process, makes a levy at his own peril; and if, in executing a writ of attachment against one person, he seizes the goods of another, the officer is responsible in damages to such person whose goods he has wrongfully seized. And if you believe from the evidence that Weaver did seize Ashcroft's goods upon the attachment against Russell, you will find for the plaintiff whatever actual damages the evidence has shown you that plaintiff has sustained by reason of such wrongful seizure."

The defendant asked the court to charge the jury:

"That if they believe from the testimony that at the time the defendant made the levy he was acting in good faith and with a purpose only to execute his duty as an officer, that he

had a right to seize the stock and was entitled to a reasonable time to separate from the stock such amount as would reasonably satisfy the attachment and to invoice the same, and that if after the sheriff had done this he offered to restore the remainder of the stock to the plaintiff, and the plaintiff refused to receive the same, then in case you find the goods were in fact and by good faith purchased the property of the plaintiff, still you will not be authorized to find against the defendant beyond the reasonable cash value of the goods actually taken and applied to the satisfaction of the attachment in his hands, with eight per cent. interest thereon from the date of the seizure."

This instruction was refused by the court.

We think that the eleventh and twelfth paragraphs of the principal charge, and the fifth, eighth, ninth, and tenth paragraphs of the charge given at request of plaintiff, presenting to the jury the idea that the transfer of the goods to Ashcroft might have been only a justifiable preference of the partnership creditors, was inappropriate under the facts of the case, and, repeated again and again as it was, was calculated to mislead the jury. The firm creditors were entitled to be first paid out of the firm assets before the transfer, and we are unable to see that the effect of the transfer was to give them any additional preference payment or security. On the contrary, if valid, its effect was to destroy that preference as to so much of the firm assets as passed into Russell's hands. In no aspect of the transaction does it admit of the construction that Russell, however honestly he may have acted in making the trade, was, in so doing, merely performing a duty to provide for the partnership debts; for such was not its effect. Indeed, in the ninth instruction, given at the request of plaintiff, we find presented the inconsistent idea that Russell's motive might have been "to get his interest in the firm accounts in order to pay on his individual debts." The tendency of that part of the charge on the subject of the right and duty to prefer partnership creditors was to lead the jury

to look upon the transfer as such a preference, and to find that it was therefore not fraudulent, but valid.

That part of the charge, (paragraph 6, given at request of plaintiff,) that "fraud will not be presumed, but must be proved like any other fact, and the burden of such proof rests on the party who alleges such fraud," should have been accompanied with some further explanation as to the character of evidence by which fraud may be established. (Sparks *v.* Dawson, 47 Tex., 144.)

The latter part of paragraph 13 of the principal charge, authorizing the jury, "if they believed that the defendant acted without probable cause, and with intent to injure the plaintiff," to find additional damages, evidently left the jury at liberty in that event to give exemplary damages. But our opinion is that there is no sufficient evidence to support a verdict for exemplary damages, and that the jury should not have been instructed on the subject. The evidence not only fails to disclose any ill-feeling or improper motive, but seems to negative such a conclusion. This error in the charge may have influenced the amount of the verdict.

Appellant complains of other parts of the charge as to the right to levy on partnership property for individual debts, but we are of opinion that the jury must have understood from the entire charge that if the transfer to Ashcroft was invalid, then the sheriff had a right to levy the attachment, and was not liable as a trespasser therefor.

He also complains of various rulings in admitting evidence, but we do not see that the court committed any material error of that sort to his prejudice, unless it be in allowing Russell to answer the following question: "For what purpose did you tell A. J. Childress, while in a conversation with him as to the contemplated sale to Ashcroft, that you wanted to make said sale?" It appears from the depositions of Childress that Russell consulted him about the trade some time before it was made, and the question had reference to that time. Although the rule is very liberal in questions of fraud

in admitting declarations as a part of the res gestæ, we think
it would be to extend it too far to allow a question as to what
the party charged with the fraud had said as to his motives
in a conversation with a third party at a time considerably
antedating the transaction. But, although there is a bill of
exceptions to the action of the court in allowing this question,
the statement of facts does not show what was the answer of
the witness. The deposition of A. J. Childress, appended to,
but only in part embraced in, the statement of facts, contains
his statement as to those declarations, but we do not find in
the record anything showing that such evidence was before
the jury.

There is still another question growing out of the defense of
Weaver, viz., that he only seized the stock and held it a rea-
sonable time to enable him to separate from it such amount
as would reasonably satisfy the attachment, and that when he
had accomplished that he offered to restore the remainder,
and the plaintiff persistently refused to receive it.

Counsel for appellant have adduced no authority for the
proposition that the action of the sheriff, if he actually seized
and held for several days the entire stock, and was guilty of
a trespass in seizing any part of it, would be so qualified by
the fact that his object was to levy on and retain only a part
of the stock, as to make it in law but a conversion of that
part. In the absence of authority, we are not prepared to
affirm or deny this as a rule of law. Whether the sheriff
wrongfully took possession of the entire stock of goods, was,
we think, mainly a question of fact.

If he did, and the conversion was complete, the fact that
he afterwards tendered back the goods, or a part thereof, does
not relieve him from full responsibility. A tort is not cured
by a tender without acceptance. (Gibbs v. Chase, 10 Mass.,
128; Vosburgh v. Welch, 11 Johns., 175.) The effect of
such tender and refusal is discussed by Justice Bronson in
Hanmer v. Wilsey, 17 Wend., 91. The case was one where
a horse was seized under an attachment illegally issued, and

on the discovery of this fact the constable returned the horse to the stable, and notified the owner, who refused to receive him. In that case, as in this, the plaintiff had, before the proffered return, commenced legal proceedings. He says: "But, independent of the fact that the plaintiff had commenced legal proceedings, there was no ground for mitigating damages. The horse had been wrongfully taken, and the plaintiff had a right to insist on being paid the value. The actual return of the horse to the plaintiff's stable without his assent was a matter of no legal consequence." Again: "It was a matter of no moment to the plaintiff what became of the horse after the original illegal taking. Replacing the animal in the plaintiff's stable without his assent was a nugatory act; it could no more operate to prejudice the plaintiff than any other disposition which the defendant might have made of the property." The plaintiff was in that case allowed to recover the value of the property. (See, also, Otis v. Jones, 21 Wend., 395.) In this case any apparent harshness in this rule is alleviated by the fact that the defendant made no effort to show that the goods so proffered back had subsequently and continuously been held for plaintiff's benefit.

By the charge of the court, the plaintiff was allowed to recover, as compensatory damages, the value of the goods seized at the time of the seizure, with eight per cent. interest. This was the correct rule if the seizure was such as to amount to a conversion. (McInroy v. Dyer, 47 Penn., 120; Field on Dam., sec. 768, et seq.; 23 Cal., 349.)

For the error in the charge, the judgment is reversed and the cause remanded.

REVERSED AND REMANDED.